Jericho COOK, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 90–SC–874–DG.

Supreme Court of Kentucky.

March 12, 1992.

Mark D. Dean, T. Sherman Riggs, Mathis, Riggs, Prather and Dean, Shelbyville, for appellant.

Chris Gorman, Atty. Gen., David A. Sexton and John S. Gillig, Asst. Attys. Gen., Criminal Appellate Div., Frankfort, David B. Reynolds, Matthews, Myles and Reynolds, Shelbyville, for appellee.

WINTERSHEIMER, Justice.

This appeal is from a decision of the Court of Appeals in a vehicular homicide case in which the Court of Appeals reversed the order of the circuit court suppressing evidence of Cook's blood alcohol content after the fatal accident.

The issues presented are whether the circuit court used the proper test in suppressing the results of the blood alcohol test; whether there was any kind of implied coercion in failing to advise Cook that the blood sample was taken for criminal investigative purposes, and whether preponderance of evidence is the standard that the Commonwealth must meet to prove voluntariness.

Cook was involved in an automobile accident when he crashed his vehicle into an oncoming car. The other driver was accompanied by his pregnant wife and an infant daughter. In Cook's vehicle there were two other passengers in addition to the driver. The driver of the other car was killed instantly, and all others except one were seriously injured.

The first police officer who responded found a partially empty whisky bottle in Cook's car and noted that the car smelled strongly of alcohol. Trooper Westbrook then arrived and was directed to go to the hospital where Cook had been taken. Upon arrival, Westbrook gave the blood alcohol content kit to hospital personnel and later talked with Cook. Westbrook assumed that the hospital had obtained written consent for the blood sample because he did not. The blood test registered the alcohol content to be .21 percent.

Cook was not under arrest or in police custody prior to or at the time of the taking of the blood sample. He was not advised of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He was subsequently indicted for one count of murder, three counts of first-degree assault and one count of driving under the influence. Cook filed a pretrial motion to suppress the blood test results. At the suppression hearing he made a general denial of giving consent to have his blood drawn. He said he did not remember talking with Trooper Westbrook and that he remembered seeing only a preacher and medical personnel while in the hospital. He said he did not remember anyone in a police uniform and did not remember blood being drawn from him for the tests. He did claim to be cooperative with everyone. The circuit judge granted the suppression motion indicating that the defendant should have been advised of the purpose for taking his blood, and that the prosecution was required to prove an intelligent waiver as opposed to simply a voluntary one. The Court of Appeals reversed the decision of the circuit court and this Court granted discretionary review.

The Court of Appeals correctly reversed the decision of the circuit court because it had erroneously determined that the prosecution was required to prove an intelligent waiver as opposed to simply a voluntary consent.

A careful examination of the record indicates that Cook freely and voluntarily gave his consent to the blood test. The determination by the circuit court that consent to search must be intelligently given in this situation was an erroneous application of the principles of consent under the Fifth Amendment to a Fourth Amendment search and seizure issue. Suppression of the blood test results was improper.

■ We must observe that Kentucky's implied consent statute, K.R.S. 186.565(1), does not apply in this situation. Cook was not under arrest or in police custody.

The blood test administered here involves the Fourth Amendment to the Federal Constitution. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), held that the Fifth Amendment is not implicated by the taking of a blood sample from a criminal suspect, but that such testing does constitute a search for

real or physical evidence which implicates the Fourth Amendment.

■ It is fundamental that all searches without a warrant are unreasonable unless it can be shown that they come within one of the exceptions to the rule that a search must be made pursuant to a valid warrant. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Consent is one of the exceptions to the requirement for a warrant. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). The test for determining if consent is constitutional is set out in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The question of voluntariness turns on a careful scrutiny of all the surrounding circumstances in a specific case.

■ When the circuit court required the prosecution to prove that consent was intelligently given, it placed an improper burden on the prosecution. The correct standard involves voluntary consent only.

■ The law does not require that Cook be advised of his *Miranda* rights or that he had a right to refuse the search. *Hohnke v. Commonwealth*, Ky., 451 S.W.2d 162 (1970). All that was required to establish consent was that the consent was voluntarily given in view of all the circumstances. *Commonwealth v. Sebastian*, Ky., 500 S.W.2d 417 (1973). A careful examination of the entire record indicates that the prosecution had established by a preponderance of the evidence that the consent given by Cook was freely and voluntarily obtained without any threat or express or implied coercion. Cf. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

A review of the transcript of evidence of the suppression hearing indicates that Cook is a reasonably intelligent young person who is able to understand the English language and can express himself in an understandable fashion. He claims that he did not remember seeing any police at the hospital or giving consent to the search.

Trooper Westbrook was at the hospital for quite some time according to his testimony until he was able to speak with Cook. When he did talk to Cook, "He was lying there. I think the other ones were getting treatment." The testimony of the trooper indicates that Cook was fully conscious at the time he spoke to him and that he was able to understand what the trooper was saying and was responsive to his questions. There is nothing in the record that shows the defendant's mental or physical condition was such that he was unable to give his permission to allow the police to obtain a blood sample. The record does not indicate that Cook was confused or tricked into giving his blood sample. He was fairly apprised of what the police wanted and why they wanted it, and the consent was freely and voluntarily given. That is all the Fourth Amendment requires. There was no constructive duress or coercion. *Schneckloth.*

The record here clearly demonstrates that Cook voluntarily consented to and cooperated in the search. There was no serious repudiation of the testimony given by the trooper. The addition of the element of intelligent consent is improper in this situation.

■ The record does not support the argument that there was any kind of implied coercion arising out of a failure to advise Cook that the blood sample was being sought for the purpose of a criminal investigation. The record does not indicate that anything was offered by Cook to refute the trooper's testimony as to the events in the hospital emergency room. The trooper specifically recalled using the term "blood alcohol content" when speaking with Cook. The trooper also observed the blood being taken by the hospital employee and recalled that he told Cook that he was under suspicion for driving under the influence. Cook has failed to demonstrate any kind of police overreaching which is related in any way to the consent given. The question of voluntariness is to be determined by an objective evaluation of police conduct and not by the defendant's subjective perception of reality.

*Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

■ Cook's final argument is that the Commonwealth should be held to a clear and positive or clear and convincing standard of proof. We do not agree. The burden of proof for the Commonwealth is to demonstrate voluntariness by a preponderance of the evidence. The United States Supreme Court has held that a state need only satisfy the preponderance standard where the state bears the burden of proof in a suppression hearing. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *United States v. Matlock, supra.* The preponderance of evidence standard is the one applied in Kentucky. *Tabor v. Commonwealth,* Ky., 613 S.W.2d 133 (1981). *Cf. Williams v. Commonwealth,* Ky.App., 734 S.W.2d 810 (1987).

Cook's citation to *Diehl v. Commonwealth,* Ky., 673 S.W.2d 711 (1984) is unconvincing. Cook's attempt to use the statement in *Diehl, supra,* which observed that a trial court's findings of fact are conclusive as to the issue raised, if supported by substantial evidence, does not relate to this situation. It has nothing to do with the burden of proof on the prosecution at a pretrial suppression hearing but was simply a discussion under what circumstances a trial court's findings may be deemed conclusive on an appellate court.

The law of Kentucky remains clear. The burden was on the Commonwealth to prove, by a preponderance of the evidence, that Cook voluntarily consented to the taking of his blood.

It is the holding of this Court that the circuit court erred in requiring the Commonwealth to prove at a pretrial suppression hearing that the consent was intelligently given as distinguished from freely and voluntarily given. The standard of proof to be used is the preponderance of evidence. Accordingly, the order suppressing the blood test results was an abuse of discretion.

The decision of the Court of Appeals is affirmed.

STEPHENS, C.J., and LAMBERT, LEIBSON, REYNOLDS and SPAIN, JJ., concur.

COMBS, J., dissents by separate opinion.

COMBS, Justice, dissenting.

I respectfully dissent. The Court of Appeals and the majority here believe that the trial court imposed an undue burden upon the Commonwealth when he suppressed the results of the blood test. Taking blood from a semi-conscious individual constitutes a seizure, which is prohibited except upon a showing of probable cause. If so much is necessary to justify the issuance of a writ, should not an individual subjected to a warrantless search, and not under arrest, at least be advised of the circumstances of the seizure?

The Court of Appeals and this Court have found that appellant freely consented. How can one consent to a thing without knowing what one is consenting to? Here, appellant had been seriously injured, to such an extent that a minister had come to the hospital to attend him. According to Trooper Westbrook's testimony he had to tell appellant where he was. Appellant remembers seeing the minister but doesn't remember seeing a policeman, and doesn't remember talking about a blood test. His condition was such that the officer did not feel that he could safely place him under arrest. In addition to this, this man reportedly had a blood alcohol content of .21, more than twice the statutory level for intoxication.

The undisputed sequence of events seem to be as follows. Trooper Miller arrived at the scene first. When Trooper Westbrook arrived, Miller told him to go with the victim to the hospital and obtain a blood sample. The trooper followed his instructions and took the blood sample kit with him to the hospital and gave it to an appropriate hospital employee. The nurse thought that the trooper had obtained written consent and Trooper Westbrook thought that she had obtained it. Neither had. The Court of Appeals noted that Westbrook did not commence talking to appellant until after he'd given the kit to

the technician, who immediately commenced taking the blood. This conversation, from which the Court of Appeals found voluntary consent, was commenced *after* they had started taking the blood. This being the case, and in view of the patient's injured and intoxicated state, I cannot see how either court could conclude that he voluntarily consented to the taking of his blood. I think it goes without saying that a person "consenting" to something must know what she/he is consenting *to.*

Even assuming that the conversation took place before the blood was taken, I cannot see how the Court could conclude that the dialogue between the officer and appellant was evidence of a voluntary consent. This dialogue is as follows:

Q: Did you advise Mr. Cook that he was under suspicion for some future charges?

A: I told him that there might be alcohol, that there was alcohol involved, and that's why we wanted the blood.

Q: Tell us how you informed Mr. Cook, if you can remember. Can you remember what you said to him about the blood alcohol test?

A: Just that there might be alcohol involved, that's why we wanted the test. That he'd been involved in an accident and the best I remember, he wanted to cooperate because—you know—

Q: So, can I take it from that you didn't say—that you didn't get into this aspect, 'This could be used against you and it might be evidence against you in a criminal case.'

A: I'm sure he understood that, because—

Q: But did you tell him that, that's my point?

A: I don't remember telling him that specifically.

I also disagree with my brethren's construction of RCr 9.78. The concluding portion of that rule is as follows: "If supported by substantial evidence the factual finding of the trial court shall be conclusive." There are no qualifications, no limitations.

The trial court unequivocally found that there was no consent. This was a finding of fact. Who better than the trial court, who heard the evidence and observed the witnesses, is in a position to evaluate that testimony? I submit that neither the Court of Appeals nor we enjoy such an advantage.

It appears that the Court of Appeals and this Court have placed too much reliance on the testimony of Trooper Westbrook. Perhaps it was an analogous situation which prompted the Barons to secure from King John Chapter 28 of the Magna Carta, which provides: "No bailiff from henceforth shall put any man to his law upon his own hare saying, without credible witnesses to prove it."

From 1850 until January 1976 the people had denied the judiciary rule-making power. According to Article 8, Section 22 of the 1850 constitution the General Assembly possessed that power. It was empowered to employ three learned men to promulgate rules of practice and procedure governing the practice of both civil and criminal law.

Our constitutional amendment took that power from the General Assembly and gave it to this Court. Section 116 of our present constitution empowers this Court to "prescribe rules governing its appellate jurisdiction ... and rules of practice and procedure for the Court of Justice."

RCr 9.78 was adopted pursuant to that power and as such is now an adjunct of the constitution which we are sworn to support. Justice Douglas, in an article appearing in the 49 Columbia Law Review, pp. 735–36, 1949, dealing with stare decisis, had this to say:

A judge looking at a constitutional decision may have compulsion to revere past history and accept what was once written. But remember above all else that it is the constitution which he swore to support and defend, not the gloss which his predecessors may have put on it.